55 CCPA

The **GILLETTE COMPANY**, Appellant,

v.

**"42" PRODUCTS LTD., Inc., Appellee.**

**Patent Appeal No. 7948.**

United States Court of Customs and Patent Appeals.

June 20, 1968.

Rehearing Denied Oct. 10, 1968.

Rowland V. Patrick, Boston, Mass., Dos T. Hatfield, Washington, D. C., Charles C. Winchester, Boston, Mass., for appellant.

William D. Sellers, Pasadena, Cal., Munson H. Lane, Washington, D. C., for appellee.

Before RICH, Acting Chief Judge, and SMITH, ALMOND and KIRKPATRICK,[*] Judges.

RICH, Judge.

This appeal is from a decision of the Trademark Trial and Appeal Board[1] dismissing an opposition to appellee's application, serial No. 151,900 filed August 27, 1957, for the registration of EXECUTIVE for after-shave lotions, pre-shave lotions, cologne, and hair dressing (hair tonic). Appellee is the assignee of record of registration No. 414,190, of May 29, 1945, to The Lander Co., Inc. (hereinafter "Lander"), for EXECUTIVE for hair tonic. Opposition is based on appellant's registration, No. 400,896, of April 6, 1943, for EXECUTIVE for safety razors and opposer's argument is predicated on the inclusion of shaving lotions and cologne in the application.

The board found that appellee was entitled to a date of first use in 1945, as successor in business to Lander. It also found that the use of EXECUTIVE on appellee's goods, above named, in 1945 concurrently with opposer's use on safety razors would not cause confusion. The board, therefore, reasoned that appellant could not be damaged by the registration and dismissed the opposition. We reverse.

The board, in our view, erred in its determination of appellee's date of first use. We hold that appellee is entitled to a date of first use no earlier than 1957 and we remand for the board to determine likelihood of confusion in light of our holding.[2]

---

[*] Senior District Judge, Eastern District of Pennsylvania, sitting by designation.

1. Consisting of Waldstreicher, Lefkowitz and Shryock, opinion by Shryock.

2. We therefore do not reach the issue which appellant urges as central: whether likelihood of confusion at the time of opposition is not sufficient to defeat registration. Appellant assures us that the question is an open one. We are generally reluctant to find disparity between the right to register a trademark and the right to use it as such. See In re National Distillers Products Co., 297 F. 2d 941, 49 CCPA 854 (1962) and Dunhill of London, Inc. v. Dunhill Tailored Clothes, Inc., 293 F.2d 685, 49 CCPA 730 (1961). See generally Callmann, Trademarks: The Right To Use vs. The Right To Register: The Dunhill Case, 51 T. M.R. 1209 (1961); Derenberg, The Third Year of Administration of the Lanham Trademark Act of 1946, 40 T.M.R. 914, 940–42 (1950); Robert, Commentary on the Lanham Trademark Act, 15 U.S.C.A. at 265, 271–72 (1948); Robert, The New Trademark Manual, 53–56, 194–202 (1947); Vandenburgh, Concurrent Registration of Trademarks, 29 JPOS 720 (1947). However, this court has done so when a majority thought the statutory language unavoidable. See In re Continental Baking Co., 390 F.2d 747, 55 CC PA —— (1968); In re Wilson Jones Co., 337 F.2d 670, 52 CCPA 805 (1964); Salem Commodities, Inc. v. Miami Margarine Co., 244 F.2d 729, 44 CCPA 932 (1957). And we have decided other cases suggestive, at least, of the unimportance of prior use. See, e. g., Contour Chair-Lounge Co. v. Englander Co., 324 F.2d 186, 51 CCPA 833 (1963). We think that another venture into this clouded area should await a firm factual basis.

We also note that ambiguities in the board's opinion seem to have led the parties to deal with this issue less precisely

The facts on which we base our decision are as follows. In 1956 Executive Toiletries, Ltd., a corporation of which Paul Klein was president and, at the time, sole stockholder, began to use variants of EXECUTIVE[3] on hair tonic, cologne, and after-shave lotion. Later that year, Mr. Klein asked the president of Lander whether he "would be willing to sell the name Executive," a trademark which Lander had used on hair tonic and after-shave lotion at least since 1945 and had registered for hair tonic on May 29 of that year. Mr. Klein, however, knew only of Lander's use of the mark on hair tonic. On November 8, 1956, Lander agreed to a contract under which its registration for EXECUTIVE, "together with the good will of the business associated with said registered trademark," was assigned to Paul Klein, personally, for a substantial consideration. Lander promised to stop using EXECUTIVE within 30 days.

Executive Toiletries, Ltd., thereupon began to use EXECUTIVE on hair tonic, pre-shave lotion, after-shave lotion, and cologne and continued to do so until its merger into appellee in 1958.[4] Appellee has since used EXECUTIVE on the same goods. It filed the application at bar in 1962. In 1962, Mr. Klein assigned his interest in EXECUTIVE and its registration to appellee. In 1963, after this opposition was begun, Lander, by *nunc pro tunc* agreement with Mr. Klein, assigned to him its *entire* right in EXECUTIVE, reciting that such had been the intention of the parties in their previous contract. Appellee thereupon amended its application to claim, for after-shave lotion, a date of first use in 1945. Mr. Klein filed an affidavit with the amendment in which he averred that he had only recently learned of Lander's use of EXECUTIVE on products other than hair tonic, the only goods, as we shall show, involved in the original assignment agreement.

In our opinion, there was no substantial basis for the board's finding that appellee had an effective date of first use in 1945. We will assume the validity of the "sale" of Lander's registration with its *pro forma* inclusion of good will. We cannot, however, permit the *nunc pro tunc* "clarification" of that sale to make it something it was not, to the prejudice of appellant.[5]

Mr. Klein had no knowledge of Lander's use of the mark on after-shave lotion at the time of the original agreement. He did not intend his "purchase" to embrace the mark so used. And, aside from the *nunc pro tunc* agreement, there is no evidence of any different intention on the part of Lander.[6]

---

than we would have preferred. It is, in fact, appellee's position that the board found no likelihood of confusion at the time of the opposition. We cannot agree with appellee's position. The board stated: "[T]here can be no doubt that at the present time persons might well assume that manufacturers of razors and razor blades also manufacture and/or market shaving lotions because of the trend in recent years toward diversification of product lines * * *."

3. E. g., JUNIOR EXECUTIVE, EXECUTIVE 9-5. EXECUTIVE, by itself, was not used.

4. Mr. Klein seems to have been sole stockholder of appellee until 1961 or 1962. He has been its president since its incorporation.

5. There is no contention that the applicable law prescribes any inquiry other than one into the manifest intent of the parties to the contract. The parties to this appeal seem to assume intent is the determinative factor. We decide on that basis.

6. Mr. Charles H. Oestreich, president of The Lander Co., Inc., was cross-examined on this point by Mr. Patrick, appellant's counsel. Exhibit 1 for identification is the original written agreement between the Lander Company and Mr. Klein. Exhibit A is the written assignment of the registration. Exhibit B is the *nunc pro tunc* agreement.

The interjections of Mr. Sellers, appellee's counsel, are as instructive as the testimony of the witness. The cross-examination by Mr. Patrick is worth setting forth:

XQ30. In other words, this Exhibit 1 for identification expresses the entire agreement between you and Paul Klein?

Nor do we think *appellee* acquired any rights by virtue of the *nunc pro tunc* assignment to Mr. Klein. Mr. Klein made no subsequent conveyance of any rights thereby acquired[7] to appellee. Appellee's position, we take it, is only this: the earlier assignment conveyed from Mr. Klein to appellee *all* of Lander's previous rights in EXECUTIVE, i. e., rights which Mr. Klein did not know he had and which appellee did not know it was receiving. We have rejected this theory. Mr. Klein did not know that Lander had any rights but those in hair

tonic, did not bargain for them, did not receive them and, at least until the *nunc pro tunc* agreement, could not convey them. We hold, therefore, that, with respect to after-shave lotion, appellee is not entitled to claim Lander as its predecessor in interest.

■ Appellant here relies solely on its registration. Therefore, appellee's numerous objections to appellant's evidence as to its use of EXECUTIVE may be disregarded. Esso Standard Oil Co. v. Bigelow-Clark, Inc., 266 F.2d 804, 46

Mr. Sellers: I object to that as being contrary to the evidence.

There has been a second agreement entered into which has been marked as Exhibit B, which supplements it.

XQ31. I amend my question.

The entire agreement made prior to the November 15th date of Exhibit A.

Mr. Sellers: I object to that as being contrary to the evidence also, because the supplemental agreement, which is Exhibit B, is dated August 1, 1963, nunc pro tunc November 15, 1956, which is the date of the original assignment.

The supplement to the assignment says it is effective as of the date of the original assignment.

XQ32. I will amend my question to say prior to your signing Exhibit A.

Mr. Sellers: Will you please repeat your question?

XQ33. Does Opposer's Exhibit 1 for identification express the entire agreement that you had with Paul Klein as president of Paul Klein Industries, Inc. at the time you signed Exhibit A?

Mr. Sellers: I object to that as being contrary to the obvious fact.

They entered into an agreement to reduce to writing the agreement that they had previous to that time.

The written agreement is merely the written agreement of the evidence that existed, and if you have the Exhibit A supplemented by Exhibit B, one being nunc pro tunc for the other, it is obvious that prior to the signing of the first agreement they had an oral understanding which was reduced to writing.

I object to that question as being contrary to the evidence.

XQ34. Please answer the question. A. Must I?

Mr. Sellers: I object to it as being misleading in that you are really asking the witness in effect that if the agreement he entered into reduced to writ-

ing the agreement he had prior to that time.

Mr. Patrick: I think I am entitled to know that at the time he signed Exhibit A, whether the letter of November 8, 1956, which is Opposer's Exhibit 1 for identification, expressed the entire understanding of the parties, and it seems to me he can answer the question yes or no.

Mr. Sellers: I object to that to the extent that it implies that the agreement of the parties is not evidenced by Exhibits A and B.

He has already stated that he did sign the agreement—correction, the letter, which is Opposer's Exhibit 1.

He said he signed that, but he has also stated that he signed the assignment and supplemental agreement which comprise Exhibits A and B.

What you are really asking him is, do the agreements which are Exhibits A and B reduce to writing the agreements that he had prior to that time or did he have some other agreement.

XQ34. Will you answer the question? A. I would say that this letter was proposed by Mark [sic, Mock] & Blum and that everything pertaining to this agreement was with the approval of our trademark attorneys.

XQ35. Did you on November 15, 1956 have any agreement with Paul Klein other than the one that was expressed in the letter of November 8, 1956?

Mr. Sellers: Do you mean in writing or oral?

XQ36. Either way. A. Whatever is in writing is the arrangements we had.

Mr. Sellers: May we stop for lunch?

7. It seems doubtful that the *nunc pro tunc* assignment transferred any interest to Mr. Klein. Capitol Tie Rak, Inc. v. Tie Rack Stores, 150 USPQ 357 (E.D.Ill.1966); Avon Shoe Co. v. David Crystal, Inc., 171 F.Supp. 293 (S.D.N.Y.1959).

CCPA 883 (1959). Further, in the absence of a counterclaim for cancellation, it is not open to an applicant, under our decisions, to prove abandonment of a registered mark in an opposition proceeding. Contour Chair-Lounge Co. v. Englander Co., supra. We, therefore, disregard appellee's argument that appellant has admitted periods of non-use.[8]

▮▮▮▮ Appellee has moved to strike certain discovery depositions put in evidence by appellant during its rebuttal period. Appellee argues: "The proffered evidence related solely to Opposer's own use of EXECUTIVE and was properly a part of its case-in-chief." We deny the motion. While proof of use of the mark is not a necessary part of an opposer's case-in-chief, *Esso Standard Oil Co.*, supra, appellant had the right to introduce proof of use after appellee raised the issue of non-use.

The decision of the board is *reversed*. The case is *remanded* to the board for further proceedings consistent with this opinion.

Reversed and remanded.

ALMOND, Judge (concurring).

I would reach the issue, avoided by the majority, of whether the time for determining the possibility of likelihood of confusion is the date of first use of the mark sought to be registered or the date of the opposition proceedings.

The statutory command concerning likelihood of confusion is expressed in prospective language: "No trade-mark * * * shall be refused registration * * * unless it * * * so resembles a mark registered * * * or a mark * * * previously used * * * by another * * * *as to be likely* * * * to cause confusion * * * *."* Section 2(d) of the Trademark Act of 1946 (15 U.S.C. § 1052(d)). (Emphasis added.) This means that registration is prohibited if there is today a likelihood of confusion, and the question of whether confusion was likely ten or twenty years ago is irrelevant.

Section 2(d) does not speak of priority but rather of conditions extant at the time the application for registration is before the Patent Office. Contour Chair-Lounge Co., v. Englander Company, 324 F.2d 186, 51 CCPA 833.

We would hardly pause to consider whether a mark could be registered if there had been likelihood of confusion twenty years previously, which likelihood had vanished prior to the application for registration. When the facts are reversed, there seems little reason for the court to adopt a different rule solely for the benefit of an applicant who had neglected to register his mark until a likelihood of confusion appeared.

I would remand this case to the Trademark Trial and Appeal Board to determine the current likelihood of confusion.

---

8. Appellee relies on the testimony of one of appellant's officers that EXECUTIVE razors were not made during World War II because of metal shortages. The testimony was apparently based on what the witness had learned from other employees of appellant. Appellee urges us to hold appellant to the "admission" of non-use but to disregard the explanatory reference to metal shortages. It seems to us that the lack of first-hand knowledge on the witness' part may have vitiated his entire statement. McCormick, Evidence § 226 (1954); 2 Wigmore, Evidence §§ 650, 657 (3d ed. 1940); cf. William S. Merrell Co. v. Anacin Co., 109 F. 2d 339, 27 CCPA 847 (1940). And, whatever the merits generally of holding a party to the testimonial "admission" of his agent, we do not think it defensible in a situation such as this in which there is a simultaneous insistence upon the incompetency of its context. Cf. Waters v. Kings County Trust Co., 144 F.2d 680 (2d Cir. 1944). See generally, McCormick, Evidence § 243 (1954); 9 Wigmore, Evidence §§ 2588–2597 (3d ed. 1940).